IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE E. FISHER, Executor of the Estate of Bradley Fisher, Deceased, | : : : |
| Plaintiff | : |
| VS. | :    3:CV-99-1976 |
| | :    (CHIEF JUDGE VANASKIE) |
| CLARK AIKEN MATIK, INC., MARQUIP, INC., WILL-PEMCO, INC., Successor in Interest to Clark Aiken Matik, Inc., a/k/a PEMCO, INC., | : : : : : |
| Defendants | : |

## MEMORANDUM

This matter is before the Court on the Motion for Summary Judgment of Defendant Marquip, Inc., claiming that the machinery in question in this products liability litigation cannot be regarded as "unreasonably dangerous" under the risk-utility analysis mandated by Pennsylvania law.[1]  See Azzarello v. Black Bros. Co., 391 A.2d 1020, 1026 (Pa. 1978).  Finding that the pertinent risk-utility factors weigh in favor of Plaintiff, the summary judgment motion will be denied.

## I. BACKGROUND

In a products liability action brought under Section 402A of the Restatement (Second) of Torts, such as this action, it is the product itself, and not the manufacturer's conduct, that is at

---

[1] Co-defendant Will-Pemco, Inc. has joined in Marquip's summary judgment motion. (See Dkt. Entry 103.)

issue.[2]  In this case, the product of concern is a complicated piece of machinery used by the International Paper Company at its plant located in Hazleton, Pennsylvania.  Specifically, involved in this accident was a paper "splicer" designed and manufactured by Defendant Marquip, Inc., and incorporated into a "sheeter" machine designed and manufactured by co-Defendant Will-Pemco, Inc., successor-in-interest to Clark Aiken Matik, Inc.

The sheeter line operated at the International Paper plant starts with very large rolls of heavy paper as raw material.  The paper rolls are unspooled, and the sheeter line ultimately cuts the heavy paper to the desired length and stacks the cut paper.  There are two pairs of roll stands that unspool the paper rolls, and each pair of roll stands is capable of feeding one roll of paper at a time to the sheeter line.  A Marquip splicer is located above each pair of roll stands.  The purpose of the Marquip splicer is to allow the sheeter line to run continuously by eliminating the need to stop the sheeter to allow for re-threading the paper each time a roll of raw material paper has been exhausted.

The splicer includes an element referred to as the "dancer roller," which is intended to move along the splicer in accordance with the size of the roll of paper being processed.  Movement of the dancer roller is enabled by a sensor called a "potentiometer."  The

---

[2] Plaintiff has also asserted claims for negligence and breach of warranties.  However, in moving to preclude evidence of negligence, Plaintiff has signaled her intent to withdraw the negligence and warranty claims in the event that Marquip's summary judgment on her strict products liability claim is denied.  (See Motion in Limine to Preclude Evidence of Negligence (Dkt. Entry 200) at 2.)

potentiometer is connected to the dancer system by a chain located in the "dancer track area." The chain interacts with the potentiometer. The dancer system itself is connected to air cylinders by cables. The air cylinders provide the force that moves the dancer roller.

The Marquip splicer is an integral component of the sheeter machine. It enables the equipment to run 24 hours a day, 7 days a week. The sheeter itself is a unique machine, specifically designed and manufactured for use by International Paper at its Hazleton plant.

On June 14, 1999, Bradley Fisher, a maintenance mechanic who had worked for International Paper for about 10 years, sustained fatal injuries in an accident involving the sheeter/splicer. The accident occurred while Fisher, with the assistance of Emil Kitlan, was attempting to dislodge a broken potentiometer chain. Kitlan, in response to an inquiry from International Paper employee Ray Adams, indicated that it was unnecessary to shut down the machinery.[3]

Fisher climbed onto a paper roll stand, the top of which was approximately 3 feet above the ground, to dislodge and remove the chain. Kitlan climbed onto a catwalk above Fisher and the Marquip splicer. In order to dislodge the chain, Mr. Fisher removed a guard that covered a sprocket. Mr. Fisher was feeding the chain to Mr. Kitlan, who was standing above him. Prior to completely removing the chain, Mr. Fisher told Mr. Kitlan to stop pulling on the chain. An instant

---

[3]Shutting down the machinery would have been an extended process and would have complicated starting a new roll of paper, thereby slowing production. Kitlan evidently did not perceive any danger in proceeding with the repair.

later, Mr. Kitlan "heard something let go," and out of the corner of his eye saw the dancer roller spring forward towards Mr. Fisher.  The dancer roller pinned Mr. Fisher's head against one of the stationary rolls, crushing his skull and causing fatal injuries.

Plaintiff claims that the sheeter/splicer was defective because of the absence of adequate warnings about the potential for sudden movement of the dancer roller if the machinery is not placed in a "zero energy state."  Plaintiff also contends that the product was defective because entry into the machinery did not trigger an automatic shut down process.  Defendants argue that recovery under § 402A is foreclosed as a matter of law because the utility of the machinery outweighs the risk of serious bodily harm.

## II. DISCUSSION

Section 402A of the Restatement (Second) of Torts, adopted by the Pennsylvania Supreme Court, see Webb v. Zern, 220 A.2d 853, 854 (Pa. 1996), provides:

> (1) One who sells any product in a defective condition unreasonable dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> > (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Liability depends upon the existence of a defect that renders the product "unreasonably dangerous." The question of whether a product is "unreasonably dangerous" is for the court to decide. Azzarello, 391 A.2d at 1026. As explained by our Court of Appeals, "in the Azzarello context, the case would not become one for the jury if the district court were able to hold as a matter of law that the risk-utility balance so favored the manufacturer that the [machinery in question] could not be deemed unreasonably dangerous." Surace v. Caterpillar, Inc., 111 F.3d 1039, 1048 (3d Cir. 1997). In making this determination, the court is to weigh "the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not full proof, might prevent the injury." Id. at 1049. Stated otherwise, "[t]he Court must . . . balance the product's social utility against its unavoidable risks to determine whether the condition of the product could be labeled 'unreasonably dangerous' and the risk of loss placed on the manufacturer." Childers v. Joseph, 842 F.2d 689, 697 (3d Cir. 1998).

> The following factors inform the risk-utility analysis:
>
> (1) The usefulness and desirability of the product – its utility to the user and to the public as a whole; (2) The safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury; (3) The availability of a substitute product which would meet the same need and not be as unsafe; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) The user's ability to avoid danger by the exercise of care in the use of the product; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the

> product, or of the existence of suitable warnings or instructions; and (7) The feasibility, on the part of the manufacturer, of spreading the loss of [sic] setting the price of the product or carrying liability insurance.

Surace, 111 F.3d at 1046.

The defendant bears the burden of proof on the risk-utility determination. Monahan v. Toro Co., 856 F. Supp. 955, 958 (E.D. Pa. 1994). The evidence on this threshold issue must be viewed in the light most favorable to the plaintiff. See Barker v. Deere & Co., 60 F.3d 158, 166 (3d Cir. 1995).

Where a product is alleged to be defective because of the absence of adequate warnings or instructions, "the social policy decision is relatively simple." Fraust v. Swift & Co., 610 F. Supp. 711, 713 (W.D. Pa. 1985). "In the case of an inadequate warning, . . . imposing the requirements of a proper warning will seldom detract from the utility of the product. At the same time, the cost of adding a warning, or of making an inadequate warning adequate, will at least in most cases be outweighed by the risk of harm if there is no warning." Id. (citation omitted).

In this case, a weighing of the risk-utility factors identified in Surace warrants the conclusion that the alleged defective condition of the machinery renders it "unreasonably dangerous." Accordingly, the questions of whether the product was in a defective condition when it left Defendants' possession and whether such defective condition was the proximate cause of the fatal injuries must be presented to the jury.

As to the first factor articulated in Surace – the utility of the machinery – the uniqueness of the product itself does not suggest that it is of particular value to the public as a whole. The product is intended to allow 24/7 production. That feature has obvious value, but incorporating safety features that would interrupt production would not so destroy the product's benefit as to predominate in favor of the manufacturer.

As to the second factor, probability of injury from use of the product, it is apparent that there is a risk of harm in undertaking ordinary maintenance of the splicer. For example, the potentiometer chain, as a mechanical device, is likely to fail at some point through ordinary wear and tear and will have to be replaced, putting the mechanic in an area of danger. It is also apparent that other maintenance work on the dancer roller system would be required from time to time. Given the size of the machine and the amount of force generated by its components, any injury occurred during maintenance is very likely to be severe. Thus, this factor predominates in favor of Plaintiff.

Plaintiff has proffered evidence of an alternative product, the third factor in the risk-utility analysis. Specifically, Plaintiff points to a design that would eliminate the need for a potentiometer chain, thus obviating the type of maintenance work that resulted in Mr. Fisher's death. Plaintiff has also produced evidence of some guarding devices, such as "light curtains," which would shut down the machinery when a worker entered a danger zone. Thus, this factor also weighs in favor of Plaintiff.

The next matter to be weighed is the ability of the manufacturer to eliminate the unsafe character of its product without impairing its usefulness or making it too expensive to maintain its utility. The evidence proffered by plaintiff with respect to features that would either eliminate the potentiometer chain or shut down the machinery if a zone of danger was invaded suffices to place this factor on Plaintiff's side of the scale. In this regard, it is important to note that Defendants have been precluded from contesting the feasibility of the alternative safer designs presented by Plaintiff's experts.

Defendants contend that the ability to avoid danger by exercising care in the use of the product tips the risk-utility analysis in their favor. In this regard, they point to evidence of a policy at the International Paper Hazleton plant that machinery be locked out and tagged out before maintenance work is performed.[4] Defendants contend that had the machinery been shut down and the air supply to the mechanical equipment eliminated, the accident could not have happened.

In assessing this factor, our Court of Appeals has instructed that the trial court consider the matter, not from the perspective of the individual injured by the product, but from the vantage point of an ordinary user of the machinery. Surace, 111 F.3d at 1051. As Judge

---

[4] As recognized in Surace, "a lockout device [is] one that 'utilizes a positive means such as a lock . . . to hold an energy isolating device in a safe position and prevent the energizing of a machine or equipment.'" 111 F.3d at 1047 (quoting 29 C.F.R. § 1910.147(b)(1996).

Becker explained:

> The proper focus . . . is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular plaintiff could have avoided this particular injury. Put differently, the user's ability to avoid injury by the exercise of care in the use of the product appears to be a design factor that may justify a more or less exacting design depending on the facts, but it is, in any case, not a vehicle for injecting a plaintiff's (alleged) failure to exercise due care into the case.

Id.

In this matter, Plaintiff has presented evidence suggesting an inadequacy of warnings concerning the danger of replacing the potentiometer chain without following machinery shut down procedures. As noted above, the risk-utility decision will rarely favor a manufacturer where there is evidence of inadequate warnings or safe usage instructions. Furthermore, Plaintiff has proffered evidence that it was only <u>after</u> Mr. Fisher's death that Defendants provide requisite instructions on returning the sheeter/splicer to a zero energy state. Even then, Defendants issued three separate service bulletins in order to convey the necessary information to eliminate energy from the dancer roller. As explained by one of Plaintiff's experts:

> This means there is a need for <u>specific</u> lockout/tagout procedures for this activity from the equipment designers. This was <u>not</u> provided prior to the accident. The need for an elaborate lockout and tagout procedure, and the lack of an appropriate lockout/tagout procedure from the equipment designers render [t]his equipment unreasonably dangerous and defective.

Report of Dr. Hutter at 5.

Defendants contend that Mr. Fisher, by his training and experience, should have

9

anticipated the danger of the dancer roller springing forward to him in the chain removal work. Plaintiff has produced evidence, however, that Mr. Fisher did not appreciate the danger confronting him in dislodging and removing the potentiometer chain. In this regard, there is evidence the Mr. Kitlan, who could be perceived as Mr. Fisher's supervisor, directed that the machinery not be shut down while the chain was being removed. Significantly, Defendants did not oppose Plaintiff's motion in limine to preclude Defendants from presenting an assumption of risk defense at trial. (Dkt. Entry 209.) Accordingly, this factor does not weigh so heavily in favor of Defendants as to compel judgment in their favor on the products liability claim.

       The final factor – the ability of the manufacturer to spread the risk of loss by setting the price of the product or carrying liability insurance – plainly favors Plaintiff. As Plaintiff observes, Marquip is in bankruptcy, and the risk of loss in this case is therefore borne by its liability carrier.

### III. CONCLUSION

For the reasons set forth above, this Court cannot hold as a matter of law that the risk-utility balance so favors Defendants as to warrant removal of the § 402A claim from the jury. Accordingly, Marquip's summary judgment motion, in which Will-Pemco has joined, will be denied. An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANE E. FISHER, Executor of the Estate of Bradley Fisher, Deceased,<br><br>**Plaintiff**<br>VS.<br><br>CLARK AIKEN MATIK, INC., MARQUIP, INC., WILL-PEMCO, INC., Successor in Interest to Clark Aiken Matik, Inc., a/k/a PEMCO, INC.,<br><br>**Defendants** | 3:CV-99-1976<br>(CHIEF JUDGE VANASKIE) |

## O R D E R

**NOW, THIS 26th DAY OF SEPTEMBER, 2005,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. The Motion for summary judgment filed on behalf of defendant Marquip, Inc. (Dkt. Entry 101) is **DENIED**.

2. A telephonic scheduling conference will be conducted on **Friday, October 21, 2005 at 10:00 a.m.** Attorney for plaintiff is responsible for placing the call to **570-207-5720** and all parties shall be ready to proceed before the undersigned is contacted.

> s/ Thomas I. Vanaskie
> Thomas I. Vanaskie, Chief Judge
> Middle District of Pennsylvania